Opinion issued May 9, 2023



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-21-00383-CV

———————————

### STEVEN I. ROCKMAN, M.D., Appellant

### V.

### OB HOSPITALIST GROUP, INC.; OB HOSPITALIST GROUP, LLC; OBHG MANAGEMENT SERVICES, LLC; JAMI WALKER; AND CHCA CLEAR LAKE L.P. D/B/A HCA HOUSTON HEALTHCARE CLEAR LAKE, Appellees

---

**On Appeal from the 281st District Court**
**Harris County, Texas**
**Trial Court Case No. 2020-59786**

---

## MEMORANDUM OPINION

Appellant Steven I. Rockman, M.D., (Dr. Rockman) sued appellees (1) Ob Hospitalist Group, Inc., (2) Ob Hospitalist Group, LLC, (3) OBHG Management Services, LLC (OBHG Management), (4) Jami Walker, and (5) CHCA Clear Lake

L.P. doing business as HCA Houston Healthcare Clear Lake (Clear Lake) for defamation and business disparagement. Dr. Rockman brings this appeal from the trial court's judgment dismissing those claims under the Texas Citizens Participation Act (TCPA). *See* TEX. CIV. PRAC. & REM. CODE §§ 27.001–.011.[1] The dispositive issues raised by Dr. Rockman on appeal are whether the trial court abused its discretion in making certain evidentiary and discovery rulings and whether the trial court erred by dismissing his claims under the TCPA.

Because the record does not show the error of which Dr. Rockman complains, we affirm.

## Background

Dr. Rockman is a physician who specializes in obstetrics and gynecology (ob/gyn). In early 2019, he was employed by Pediatrix Medical Services, Inc., a company affiliated with Mednax Health Solutions Partner (together, Mednax). Through Mednax, Dr. Rockman worked as a locums tenens[2] ob/gyn physician at Clear Lake and other hospitals.

---

[1]   In 2019, the Texas Legislature amended the TCPA. The amendments became effective September 1, 2019. Act of May 17, 2019, 86th Leg., R.S., ch. 378, § 11, 2019 Tex. Sess. Law Serv. 684, 687. Because this suit was filed after that date, all citations to the TCPA refer to the amended statute.

[2]   "The term 'locum tenens' is defined as a '[p]hysician who substitutes for another temporarily.'" *Benavides v. Garcia*, 278 S.W.3d 794, 797 (Tex. App.—San Antonio 2009, pet. denied) (quoting TABER'S CYCLOPEDIC MEDICAL DICTIONARY L-38 (10th ed. 1965)); *see* "locum tenens," Merriam-Webster, https://www.merriam-webster.com/dictionary/locum%20tenens (defining "locum tenens" as "one filling

2

On February 2, 2019, Dr. Rockman assisted a doctor employed by Clear Lake with a cesarean section delivery. As Dr. Rockman testified in his affidavit offered in support of his original and amended petitions, the delivery was difficult, and "the fetus was [delivered] stillborn." The next day, Dr. Rockman received a phone call about the stillborn delivery from Dr. Brian Gilpin, who worked for Mednax, and he and Dr. Gilpin "reviewed the clinical history and outcome" of the delivery. At Dr. Gilpin's request, Dr. Rockman "reviewed the case with [Mednax's] attorney."

A few days later, Mednax's operations director told Dr. Rockman that he was being placed on paid administrative leave. Dr. Rockman testified that, when he asked why, the operations director did not respond. Shortly thereafter, Clear Lake's CEO, Todd Caliva, sent Dr. Rockman a letter informing him that on February 7, 2019, he had notified Mednax that, "in [his] discretion," he "no longer [chose to] accept" Mednax's "use of [Dr. Rockman] as a representative at the Hospital under the Professional Services Agreement between the Hospital and [Mednax]." Caliva explained that it was "an administrative action and [did] not entitle [Dr. Rockman] to a hearing or appeal" based on a provision in the hospital's "Medical Staff Bylaws." Caliva also informed Dr. Rockman that the "action [was] not reportable to the National Practitioner Data Bank or Texas Medical Board."

---

an office for a time or temporarily taking the place of another—used especially of a doctor or clergyman").

3

Caliva also explained that Dr. Rockman held "Obstetrics and Gynecological *locum tenens* privileges to provide services at [Clear Lake] through [his] affiliation" with Mednax. And, because Mednax was no longer permitted to use Dr. Rockman as a representative at Clear Lake, Dr. Rockman was "unable to exercise [his] *locum tenens* privileges at the Hospital." Caliva told Dr. Rockman that, if he sought privileges beyond his locum tenens privileges held through Mednax, then he was required to submit the request in writing to Caliva. The request would then be evaluated under the hospital's credentialling policy.

Dr. Rockman testified in his affidavit that he was "purged from the on-call schedules" at Clear Lake and several other hospitals. In May 2019, Dr. Gilpin called him "indicating [that Dr. Rockman's] 'case' had been discussed at the highest corporate levels." Dr. Gilpin informed Dr. Rockman that Mednax recommended "an assessment of [his] health, competency and cognitive skills."

Mednax continued to pay Dr. Rockman for several months. On September 12, 2019, Dr. Rockman accepted Mednax's offer for him to resign. Dr. Rockman then pursued hospital privileges at Methodist Hospital in San Antonio.

At that time, OBHG Management was tasked with finding ob/gyn physicians to staff Methodist Hospital. To locate qualified physicians, OBHG Management sometimes subcontracted with staffing companies, including AMN Healthcare (AMN). AMN would sometimes subcontract with other staffing companies to locate

physicians. AMN assisted OBHG Management with Dr. Rockman's placement at Methodist, and the record indicates that MPLT Healthcare (MPLT), a company specializing in locum tenens staffing, was in turn assisting AMN.

Before granting privileges to a physician, a hospital, such as Methodist, must obtain a verification from the hospitals at which the physician previously had privileges to confirm the physician's work history. Pethy Dowe-Royal, an MPLT credentialing specialist, was assigned to facilitate the credentialing process for Dr. Rockman with Methodist Hospital.

On September 24, 2019, Dowe-Royal emailed Dr. Rockman. In her email, Dowe-Royal stated that MPLT "just received a verification" from Clear Lake in which it "noted" that Dr. Rockman "was removed from staff on 2/5/2019 due to patient care issues." Dowe-Royal asked Dr. Rockman to provide an explanation regarding the circumstances of his departure from Clear Lake. Dr. Rockman responded by email that day. In his response, he discussed the stillborn delivery that had occurred at Clear Lake on February 2, 2019 and his participation in it. Dr. Rockman stated that he had assisted the Clear Lake doctor who performed the cesarean section involved in the delivery. He claimed that, after the stillborn delivery, Clear Lake had ended its relationship with him to protect their staff doctor from criticism.

On October 22, 2019, MPLT sent Dr. Rockman correspondence listing the dates that he was scheduled to work at Methodist Hospital, starting in December 2019. The correspondence noted that Dr. Rockman's "[s]tart date and assignment [were] contingent upon credentialing" with Methodist.

On November 22, 2019, Jami Walker, OBHG Management's Director of Hospital Operations, sent an email about Dr. Rockman to seven recipients. Four of the email's recipients worked for OBHG Management and three worked for AMN. The email read in part:

Good Morning Team,
I'm so sorry to start your Friday with this, but we have some significant issues at Methodist Children's.

I attended a meeting at Methodist yesterday and learned we are in a very serious situation.

**Dr. Rockman** :The potential likelihood of his privileging isn't a good outlook and we need to remove hi from the schedule and withdraw his application. He apparently has license sanctions, has had privileges revoked and is under investigation currently. In the meeting yesterday I was told that this was not disclosed and was discovered. Regardless, this physician is not a candidate for OBHG and never should have been.

(Typographical error in original).

Subsequently, Dr. Rockman's application for privileges to work as an ob/gyn physician at Methodist Hospital was withdrawn from consideration, and Dr. Rockman was not granted privileges at the hospital.

On September 23, 2020, Dr. Rockman filed suit, later amending his petition. As defendants, Dr. Rockman named Jami Walker, OBHG Management, Ob Hospitalist Group, Inc., and Ob Hospitalist Group, LLC (together, OBHG Defendants). Dr. Rockman also sued Clear Lake. He asserted causes of against all

defendants for defamation—specifically, defamation per se—and business disparagement.

Dr. Rockman's defamation and business disparagement claims against Clear Lake were based on Clear Lake's statement in its verification—as reflected in the September 24 email from Dowe-Royal—that Dr. Rockman "was removed from staff on 2/5/2019 due to patient care issues." Dr. Rockman asserted that Clear Lake's statement was false because he "had not, to his knowledge and belief, been under any suspicion whatsoever concerning 'patient care issues.'"

Dr. Rockman's defamation and business disparagement claims against the OBHG Defendants were based on Walker's November 22 email in which she stated that she had learned from Methodist, at a meeting the previous day, that Dr. Rockman had license sanctions, privileges revoked, and was currently under investigation. He asserted that the statement was false because he "had no license sanctions, had never had privileges revoked and, to the best of his knowledge and belief, was not 'under investigation.'" He alleged that Walker had acted as the agent of all OBHG Defendants when she sent the November 22 email.

Dr. Rockman asserted that both of the complained-of statements were defamatory, "impeach[ing] his professional and personal skills, conduct, honesty and integrity." He alleged that Clear Lake and the OBHG Defendants had acted negligently and maliciously in "failing to ascertain the truth." And he alleged that

7

the defamatory statements caused his reputation to be "severely injured." Dr. Rockman claimed that, since the publication of the two statements, he could not obtain a hospital assignment, resulting in lost wages and benefits. He sought an award of actual and exemplary damages against all defendants.

Clear Lake filed a TCPA motion to dismiss Dr. Rockman's claims. Ob Hospitalist Group, Inc. and Ob Hospitalist Group, LLC each filed a special appearance, and subject to the special appearances, the OBHG Defendants also filed a TCPA motion to dismiss. All defendants asserted that Dr. Rockman's defamation and business disparagement claims were based on the exercise of their right to free speech about Dr. Rockman's provision of medical services and his professional competency, which they asserted were matters of public concern. Clear Lake also asserted that the claims were based on its right of association. The defendants contended that Dr. Rockman could not present clear and specific prima facie evidence to support the elements of his claims. All defendants asserted that the affirmative defense of substantial truth defeated Dr. Rockman's defamation claims. The OBHG Defendants claimed that the qualified privilege of common interest protected Walker's complained-of statement.

In his response, Dr. Rockman argued that the TCPA did not apply to his lawsuit because his claims were not based on or in response to communications made in connection with a matter of public concern. He also asserted that he offered

8

clear and specific evidence to establish a prima facie case for each element of his defamation and business disparagement claims. And he claimed that the defendants had not established the affirmative defenses of truth and qualified privilege.

On February 26, 2021, the trial court signed an order granting Ob Hospitalist Group, LLC's special appearance. Two weeks later, the trial court signed an order denying Ob Hospitalist Group, Inc.'s special appearance. Ob Hospitalist Group, Inc. filed an interlocutory appeal in this Court, challenging the trial court's denial of its special appearance.[3]

Dr. Rockman filed a motion to depose Clear Lake's representative "with the most knowledge regarding the verification of Dr. Rockman that was sent to [Methodist] or its agent." On April 27, 2021, the trial court conducted a hearing on the motion. At the hearing, Clear Lake's counsel stipulated on the record that, as reflected in Dowe-Royal's email, Clear Lake had stated in its verification that Dr. Rockman was removed from Clear Lake's staff "due to patient care issues." At the end of the hearing, the trial court denied Dr. Rockman's motion.

On May 25, 2021, the trial conducted a hearing on the defendants' TCPA motions to dismiss. At that hearing, the trial court also heard arguments regarding

---

[3] Dr. Rockman did not appeal the order granting Ob Hospitalist Group, LLC's special appearance.

9

the OBHG Defendants' hearsay objections to two exhibits offered in support of Dr. Rockman's response.

On June 24, 2021, the trial court signed an order sustaining the OBHG Defendants' objections to Dr. Rockman's evidence. The trial court also signed two orders (1) granting the defendants' TCPA motions, (2) dismissing Dr. Rockman's claims against all defendants with prejudice, and (3) awarding the defendants attorney's fees, including conditional appellate attorney's fees. Together, the two orders disposed of all parties and all claims, thus constituting a final judgment. *See Mayfield v. N. Vill. Green I Homeowner's Ass'n, Inc.*, No. 01-12-00748-CV, 2014 WL 2538554, at *8 (Tex. App.—Houston [1st Dist.] June 5, 2014, pet. denied) (mem. op.) (concluding that three orders "[t]aken together . . . disposed of all issues and all parties and thus constitute a final and appealable judgment").

Dr. Rockman filed the instant appeal from the final judgment. At that point, the record and the parties' briefs had already been filed in Ob Hospitalist Group, Inc.'s interlocutory appeal from the order denying its special appearance. This Court then notified the parties that the order denying Ob Hospitalist Group, Inc.'s special appearance had merged into the final judgment. *See Elec. Reliability Council of Tex., Inc. v. Panda Power Generation Infrastructure Fund, LLC*, 619 S.W.3d 628, 635–36 (Tex. 2021). Because the order had merged into the final judgment, the Court notified the parties of its intent to dismiss the interlocutory appeal and to transfer the

record and the briefs to the instant final-judgment appeal. Ob Hospitalist Group, Inc. responded with a "Consent to Transfer and Dismissal," agreeing that the interlocutory appeal should be dismissed and that the briefs and the record, including the notice of appeal, from the special-appearance interlocutory appeal should be transferred to the instant final-judgment appeal. On November 30, 2021, we dismissed the interlocutory appeal and transferred the record and the parties' briefs from that appeal to this appeal from the final judgment. *See Ob Hospitalist Grp., Inc. v. Rockman*, No. 01-21-00156-CV, 2021 WL 5570139, at *1–2 (Tex. App.—Houston [1st Dist.] Nov. 30, 2021, no pet.) (mem. op.) (per curiam). In its appellee's brief filed in the final-judgment appeal, Ob Hospitalist Group, Inc. incorporated by reference its briefing from the interlocutory appeal but indicated that its challenge to the denial of its special appearance need not be reached if this Court affirmed the dismissal of Dr. Rockman's claims against it under the TCPA.

Although Dr. Rockman raises three issues on appeal, we need only address Dr. Rockman's first two issues, which are dispositive. We first address Dr. Rockman's second issue because its disposition may affect the resolution of Dr. Rockman's first issue. *See Tex. Mut. Ins. Co. v. Sara Care Child Care Ctr., Inc.*, 324 S.W.3d 305, 310 (Tex. App.—El Paso 2010, pet. denied) (considering evidentiary issue first because it affected analysis of summary-judgment issue).

**Evidentiary and Discovery Complaints**

Dr. Rockman's second issue raises two sub-issues in which he complains of the trial court's evidentiary and discovery rulings.

## A.      Evidentiary Complaint

In his first sub-issue, Dr. Rockman complains of the trial court's order sustaining the OBHG Defendants' hearsay objections to two of his exhibits, Exhibits B-1 and B-2, offered to support his response to the TCPA motions.

### 1.      *Relevant background*

Exhibits B-1 and B-2 were attached to Exhibit B, a declaration signed by Dr. Rockman's attorney. In his declaration, Dr. Rockman's counsel attested that Exhibit B-1 contained "true and correct copies" of a letter, and two emails attached to the letter, that Dr. Rockman's counsel had received from Methodist's in-house counsel. Dr. Rockman's counsel also attested that Exhibit B-2 contained "true and correct copies" of "an email and all attachments" that he had received from AMN's attorney.

In the letter contained in Exhibit B-1, Methodist's in-house counsel explained that the hospital had contracted with the "OBHG Group" to provide obstetricians to the meet the hospital's obstetrical needs. He stated that the obstetricians underwent credentialling by Methodist to obtain clinical privileges at the hospital. He explained that Methodist's credentialling process was privileged and confidential and that the OBHG Group played no part in that review process. He said that Methodist met with

12

the OBHG Group once a week to discuss, among other things, the status of the applications for the OBHG Group's obstetricians. He stated that the hospital's records showed that Walker had not attended the weekly November 21, 2019 meeting, even though Walker indicated in her November 22 email that she had attended the meeting. Attached to the in-house counsel's letter were two emails from Methodist employees about the November 21 meeting.

Exhibit B-2 contained an email from AMN's counsel to Dr. Rockman's counsel regarding a Rule 202 pre-suit petition filed by Dr. Rockman that sought to depose an AMN representative.[4] *See* TEX. R. CIV. P. 202. Among the documents attached to the email were other emails to and from AMN personnel and records concerning Dr. Rockman's education and licensing.

The OBHG Defendants filed objections to Exhibits B-1 and B-2, asserting that both exhibits contained inadmissible hearsay. They pointed out that Exhibit B-1 was "an unsworn statement in letter form" that contained "factual allegations . . . not within the personal knowledge" of Methodist's counsel. They asserted that the statements in the letter were also "hearsay within hearsay" because the "purported statements" were made "by other persons [and] allegedly conveyed to [Methodist's

---

[4] The clerk's record in this appeal does not contain the Rule 202 petition because the Rule 202 proceeding was filed in a different trial court under a separate cause number from this suit.

13

counsel].” And they asserted that the letter was offered “for the truth of the matters asserted therein.”

Similarly, the OBHG Defendants pointed out that the email from AMN’s counsel to Dr. Rockman’s counsel in Exhibit B-2 “[was] not sworn and [was] being offered for the truth of the matters stated therein.” They also pointed out that the records regarding Dr. Rockman’s education and licensing attached to AMN’s counsel’s email were unauthenticated, and they emphasized that the attached emails from AMN employees constituted inadmissible hearsay.

The OBHG Defendants reasserted their hearsay objections at the hearing on the TCPA motions. The trial court did not rule on the objections at the hearing but signed an order sustaining the OBHG Defendants’ objections to Exhibits B-1 and B-2 the same day that it granted the TCPA motions to dismiss, thus excluding the exhibits from consideration in support of Dr. Rockman’s response to the motions.

### 2. *Standard of Review*

We review a trial court’s evidentiary rulings for an abuse of discretion. *Sw. Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 727 (Tex. 2016); *see Day v. Fed’n of State Med. Bds. of the U.S., Inc.*, 579 S.W.3d 810, 817 (Tex. App.—San Antonio 2019, pet. denied) (applying abuse of discretion evidentiary standard in TCPA context). A trial court abuses its discretion when it acts arbitrarily or

14

unreasonably or without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985).

### 3. Analysis

On appeal, Dr. Rockman does not argue that the contents of the Exhibits B-1 and B-2 were not hearsay, nor does he assert that a hearsay exception applied. *See* TEX. R. EVID. 801(d) (providing that hearsay is (1) statement that declarant makes not while testifying at current trial or hearing (2) offered to prove truth of matter asserted), 803 (listing hearsay exceptions); *see also Petros v. Bodine*, No. 07-19-00019-CV, 2020 WL 2107806, at *2 (Tex. App.—Texarkana May 1, 2020, no pet.) (mem. op.) (stating that appellant "failed to address in her appellate brief why the trial court erred in deeming the report and its content inadmissible hearsay," which was "her burden on appeal").

Instead, Dr. Rockman asserts that the trial court abused its discretion in sustaining the hearsay objections to Exhibits B-1 and B-2 because the court applied the standard used to determine the admissibility of evidence in a summary-judgment proceeding. Contrary to Dr. Rockman's assertion, that was the correct standard to apply to determine whether the OBHG Defendants' objections to Exhibits B-2 and B-2 should be sustained.

TCPA section 27.006(a) provides that, in a TCPA proceeding, a court should consider evidence that it could consider in a summary-judgment proceeding:

> In determining whether a legal action is subject to or should be dismissed under this chapter, the court shall consider the pleadings, *evidence a court could consider under Rule 166a, Texas Rules of Civil Procedure [the summary-judgment rule]*, and supporting and opposing affidavits stating the facts on which the liability or defense is based.

TEX. CIV. PRAC. & REM. CODE § 27.006(a) (emphasis added). In other words, aside from pleadings and qualifying affidavits, section 27.006(a) requires that evidence be admissible under Rule of Civil Procedure 166a in a summary-judgment proceeding for that evidence to be the type of evidence considered in a TCPA proceeding. *See id.* If it is not, then it should not be considered. *See id.*

Rule 166a allows evidence only in certain forms, such as affidavits, deposition transcripts, interrogatory answers, or other discovery responses. *See* TEX. R. CIV. P. 166a. The complained-of evidence contained in Exhibits B-1 and B-2, such as the letter from Methodist's counsel and the attached emails, were in none of those forms. It is well-settled that "[a] trial court may not consider inadmissible hearsay evidence over a party's objection in ruling on a motion for summary judgment." *Rodriguez v. Karstens*, No. 10-14-00143-CV, 2015 WL 7074677, at *4 (Tex. App.—Waco Nov. 12, 2015, no pet.) (mem. op.); *see H & H Steel Fabricators, Inc. v. Wells Fargo Equip. Fin., Inc.*, No. 02-15-00391-CV, 2016 WL 6277371, at *3 (Tex. App.—Fort Worth Oct. 27, 2016, no pet.) (recognizing that affidavit "based on hearsay is incompetent as summary-judgment proof"); *Zahorik v. Metro. Life Ins. Co.*, No. 14-14-00564-CV, 2015 WL 4051972, at *2 (Tex. App.—Houston [14th Dist.] July 2,

2015, no pet.) (mem. op.) ("A trial court cannot consider hearsay evidence in ruling on a motion for summary judgment."). Thus, under TCPA section 27.006(a), hearsay evidence contained in unsworn statements, like those in Exhibits B-1 and B-2, should not be considered in a ruling on a TCPA motion to dismiss.[5] *See* TEX. CIV. PRAC. & REM. CODE § 27.006(a).

We disagree with Dr. Rockman that the trial court abused its discretion in sustaining the OBHG Defendants' objections to the exhibits because the court applied the evidentiary standard used in summary-judgment proceedings. To the contrary, it was the proper standard to apply. Applying that standard, the trial court properly exercised its discretion by sustaining the hearsay objections to Exhibits B-1 and B-2.

Dr. Rockman also asserts that his amended response to the TCPA motions was a "pleading," and that, because Exhibits B-1 and B-2 were attached to the

---

[5]     As mentioned, section 27.006(a) states that in determining the TCPA's application to a legal action the court shall consider the pleadings and "supporting and opposing affidavits stating the facts on which the liability or defense is based." TEX. CIV. PRAC. & REM. CODE § 27.006(a). We note that at least one court has determined that "supporting and opposing affidavits" need not comply with the summary-judgment standard required for affidavits found in Rule 166a(f) when the affidavit meets section 27.006(a)'s requirement of "stating the facts on which the liability or defense is based." *See Equine Holdings, LLC v. Jacoby*, No. 05-19-00758-CV, 2020 WL 2079183, at *4 (Tex. App.—Dallas Apr. 30, 2020, pet. denied) (citing *MVS Int'l Corp. v. Int'l Advert. Sols., LLC*, 545 S.W.3d 180, 192 (Tex. App.—El Paso 2017, no pet.)). Because Exhibits B-1 and B-2 were not "supporting and opposing affidavits," we need not consider that issue. Nor were the exhibits "pleadings" as we discuss *infra*.

amended response, they were part of the "pleading." He points out that a trial court may consider pleadings when determining whether a legal action should be dismissed under the TCPA. *See id.* But Dr. Rockman provides no legal authority to support his position that his amended response was a "pleading." We note that other Texas courts have concluded that neither a TCPA motion nor a response to a TCPA motion are considered pleadings when determining whether a legal action should be dismissed under the TCPA. *See Te Lun Wang v. Xiangyu Cao*, No. 05-19-00918-CV, 2020 WL 7296999, at *4 n.6 (Tex. App.—Dallas Dec. 11, 2020, no pet.) (mem. op.) ("Wang's unverified response to the motion to dismiss is not a pleading or an affidavit, so it is not evidence in a TCPA proceeding."); *MacFarland v. Le-Vel Brands LLC*, No. 05-16-00672-CV, 2017 WL 1089684, at *17 (Tex. App.—Dallas Mar. 23, 2017, no pet.) (mem. op.) (explaining that TCPA motion to dismiss was not "part of any pleading or affidavit" and was not evidence under TCPA); *Bacharach v. Doe*, No. 14-14-00947-CV, 2016 WL 269958, at *1 (Tex. App.–Houston [14th Dist.] Jan. 21, 2016, no pet.) (mem. op.) (concluding defendant's TCPA motion to dismiss was not "pleading" under Texas Rule of Civil Procedure 45 and unverified factual assertions therein could not "be considered competent evidence under the

TCPA"). Thus, we conclude that Dr. Rockman's assertion that Exhibits B-1 and B-2 should have been considered by the trial court as pleadings is without merit.[6]

Finally, Dr. Rockman asserts that the exhibits should not have been excluded from evidence because his attorney authenticated them in his declaration. *See* TEX. R. CIV. EVID. 902. However, admissibility and authenticity are two different evidentiary concepts. *Petros*, 2020 WL 2107806, at *1; *see H2O Sols., Ltd. v. PM Realty Grp., LP*, 438 S.W.3d 606, 623 n.6 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) ("Authenticity of a document and admissibility of that document under an exception to the hearsay rule are separate inquiries."). A document may be authenticated but still not admissible if it contains hearsay not subject to a hearsay exception. *See Petros*, 2020 WL 2107806, at *1. Stated differently, "while a writing may not be subject to exclusion on the basis that the proponent failed to authenticate it, it may be excluded if it constitutes inadmissible hearsay. Consequently, the proponent would have to overcome both the hearsay and authentication bar to gain admission of the evidence." *Id.* Here, even if the exhibits were properly

---

[6] Dr. Rockman's amended response was not verified. Therefore, we need not determine whether a verified response could constitute an affidavit under section 27.006(a). *See Te Lun Wang v. Xiangyu Cao*, No. 05-19-00918-CV, 2020 WL 7296999, at *4 n.6 (Tex. App.—Dallas Dec. 11, 2020, no pet.) (mem. op.); *cf. Evans v. MIPTT, L.L.C.*, No. 01-06-00394-CV, 2007 WL 1716443, at *5 (Tex. App.—Houston [1st Dist.] June 14, 2007, no pet.) (mem. op.) (holding that verified response to motion for summary judgment was not summary-judgment evidence).

authenticated, Dr. Rockman has not shown on appeal that it was outside the trial court's discretion to sustain the hearsay objections to them. *See id.*

We overrule Dr. Rockman's first sub-issue in his second issue.

**B.     Discovery Complaint**

In his second sub-issue, Dr. Rockman complains of the trial court's denial of his motion to depose Clear Lake's representative "with the most knowledge regarding the verification of Dr. Rockman that was sent to [Methodist] or its agent." We note that Dr. Rockman's argument for this sub-issue is comprised of one paragraph in his brief. In that paragraph, he identifies no pertinent legal authority about discovery under the TCPA. *See* TEX. R. APP. P. 38.1(i) ("The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record."). But, even construing his brief liberally, Dr. Rockman has failed to demonstrate that the trial court abused its discretion in denying his request to depose Clear Lake's representative. *See ADB Interest v. Wallace*, 606 S.W.3d 413, 439 (Tex. App.—Houston [1st Dist.] 2020, pet. denied) (recognizing that abuse-of-discretion standard applies to trial court's rulings on discovery motions under TCPA).

The record shows that the trial court signed an order permitting Dr. Rockman to take the deposition of Dowe-Royal—the author of the September 24 email stating that Clear Lake had noted in its verification that Dr. Rockman had been removed

from staff on February 5 "due to patient care issues." In seeking to depose Clear Lake's representative, Dr. Rockman informed the trial court that he had learned that Dowe-Royal had limited knowledge about the verification because she had not directly received the verification but had acquired information about the verification's contents from an outside credentialling agency retained by Methodist Hospital. In response, Clear Lake, through its counsel, stipulated at the hearing on the motion that Clear Lake had stated in its verification that Dr. Rockman was removed on February 5, 2019 "due to patient care issues." But, even after the stipulation, Dr. Rockman told the trial court that he still wanted to depose Clear Lake's representative.

The filing of a motion to dismiss under the TCPA stays "all discovery in the legal action" until the trial court rules on the motion. TEX. CIV. PRAC. & REM. CODE § 27.003(c). "On a motion by a party or on the court's own motion and on a showing of good cause, the court may allow specified and limited discovery relevant to the motion [to dismiss]." *Id*. § 27.006(b).

As discussed in more detail below, the non-moving party responding to a TCPA motion has the burden to establish by "clear and specific evidence a prima facie case for each essential element" of his claim. *Id.* § 27.005(c). "Some merits-based discovery may be relevant to the extent that it seeks information to assist the non-movant to meet its prima facie burden." *Bauta v. Mulvey*, 646 S.W.3d 347, 357

21

(Tex. App.—Corpus Christi 2022, pet. denied). However, "such merits-based discovery must still be 'specified and limited' because a prima facie standard generally 'requires only the minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true.'" *Id.* (quoting *In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d 218, 223 (Tex. 2004) (orig. proceeding)).

When Dr. Rockman pursued deposing a Clear Lake representative after Clear Lake had stipulated to making the statement in the verification, the trial court told Dr. Rockman that it "sound[ed] like" he was seeking "full-blown discovery." The trial court asked him what he was seeking "from this limited deposition that just goes into the TCPA response." Dr. Rockman, through his attorney, responded that he wanted to learn "the underlying factual situation that shows that he was actually let go for patient-care issues" and why the stipulation acknowledging that he was removed for patient care issues was "opposite of the letter that was sent from Mr. Caliva saying that [Dr. Rockman] was let go for administrative reasons."

Clear Lake responded that, when read in context, the administrative action mentioned in Caliva's letter referred to the contract between Clear Lake and Mednax that permitted Clear Lake to cease using any of Mednax's doctors for any reason, which would include patient care issues. Clear Lake also pointed out that "Dr. Rockman's own affidavit show[ed] this [arose] out of a patient-care issue in which there was a stillborn child." Clear Lake asserted that no further discovery was needed

22

and that its TCPA motion was ready to be decided. Dr. Rockman responded that, if he was terminated for patient-care issues, then he was entitled to certain review processes, such as a peer review, under state and federal law, which had not occurred. He indicated that he needed the deposition to further explore that issue. The trial court then asked him, "How does that not go into the full-blown merits of the case?" Dr. Rockman responded that he was "not saying it won't." At that point, the trial denied Dr. Rockman's motion.

Given the record, we conclude that the trial court could have reasonably determined that Dr. Rockman's deposition request did not seek "specified and limited discovery," as required by the TCPA. *See* TEX. CIV. PRAC. & REM. CODE § 27.006(b). We hold that the trial court did not abuse its discretion in denying Dr. Rockman's motion.

We overrule Dr. Rockman's second sub-issue in issue two.

### Dismissal under the TCPA

In his first issue, Dr. Rockman contends that the trial court erred in granting the OBHG parties' and Clear Lake's motions to dismiss under the TCPA.

### A. Statutory Framework & Standard of Review

The TCPA protects citizens who associate, petition, or speak on matters of public concern from retaliatory lawsuits that seek to intimidate or silence them. *See id.* § 27.002. That protection comes in the form of a "special motion to dismiss . . .

23

for any suit that appears to stifle the defendant's exercise of those rights." *Youngkin v. Hines*, 546 S.W.3d 675, 679 (Tex. 2018) (internal quotation marks omitted). Review of a TCPA motion to dismiss involves a three-step process. *See Montelongo v. Abrea*, 622 S.W.3d 290, 296 (Tex. 2021). In the first step, the movant must demonstrate that the TCPA applies. *See* TEX. CIV. PRAC. & REM. CODE § 27.005(b). To meet this burden, a movant must demonstrate that the legal action is based on or is in response to the movant's exercise of one of the rights listed in section 27.005(b), including the right of free speech. *See id.* §§ 27.003(a), 27.005(b)(1)(A).

If the first step is met—that is, the movant has shown that the TCPA applies— the burden then shifts to the non-movant under the second step to establish by "clear and specific evidence a prima facie case for each essential element of the claim in question." *Id.* § 27.005(c). Under the third step—even if the non-movant satisfies the second step—the court will nonetheless dismiss the legal action "if the moving party establishes an affirmative defense or other grounds on which the moving party is entitled to judgment as a matter of law." *Id.* § 27.005(d).

We review de novo the denial of a TCPA motion to dismiss. *Holcomb v. Waller Cnty.*, 546 S.W.3d 833, 839 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). We likewise interpret the TCPA and decide whether it applies to a legal action de novo. *See Youngkin*, 546 S.W.3d at 680. As mentioned, the TCPA provides that, when determining "whether a legal action is subject to or should be dismissed

24

under this chapter, the court shall consider the pleadings, evidence a court could consider under Rule 166a, Texas Rules of Civil Procedure, and supporting and opposing affidavits stating the facts on which the liability or defense is based." TEX. CIV. PRAC. & REM. CODE § 27.006(a). We view the pleadings and evidence in the light most favorable to the nonmovant. *Kassab v. Pohl*, 612 S.W.3d 571, 577 (Tex. App.—Houston [1st Dist.] 2020, pet. denied).

## B. TCPA's Applicability

Clear Lake and the OBHG Defendants assert that the TCPA applies to Dr. Rockman's defamation and business disparagement claims because the claims are based on or in response to Clear Lake's and the OBHG Defendants' exercise of their right of free speech. The TCPA defines the "exercise of the right of free speech" to mean "a communication made in connection with a matter of public concern."[7] TEX. CIV. PRAC. & REM. CODE § 27.001(3). As applicable here, "matter of public concern" means "a statement or activity regarding . . . a matter of political, social, or other interest to the community" or "a subject of concern to the public." *Id.* § 27.001(7)(B)–(C).

---

[7] Communication" as defined in the TCPA includes "making or submitting of a statement or document in any form or medium, including oral, visual, written, audiovisual, or electronic." TEX. CIV. PRAC. & REM. CODE § 27.001(1). Dr. Rockman does not dispute that each statement on which he bases his claims was a "communication."

25

To determine the nature of a legal action and the applicability of the TCPA, the plaintiff-nonmovant's pleadings are the best evidence. *See Hersh v. Tatum*, 526 S.W.3d 462, 467 (Tex. 2017). In his pleadings, Dr. Rockman bases his defamation and business disparagement claims on two statements.

The first statement underlying Dr. Rockman's claims was Clear Lake's statement in its verification that Dr. Rockman had been removed from its staff on February 5 "due to patient care issues." Dr. Rockman alleged that the "defamatory and disparaging statement" was made by Clear Lake "in response to a verification request from Methodist Hospital or Defendant OBHG" and "was provided to Methodist." He also alleged that the "negative verification information" was made "relating to" his application for hospital privileges at Methodist Hospital.

The second statement was Walker's statement in her November 22 email, sent to AMN and OBHG representatives, in which she conveyed that she had learned at a meeting with Methodist Hospital the previous day that Dr. Rockman "apparently has license sanctions, has had his privileges revoked and is under investigation currently.'' The statement was made in connection with Dr. Rockman's application to obtain privileges from Methodist to work as an ob/gyn physician at the hospital. In his pleadings, Dr. Rockman characterized the statement as being made "in regard to his professional integrity and clinical skills," and he claimed that he was informed by MPLT that his hospital privileges at Methodist were not granted "due to [those]

26

statements." Dr. Rockman alleged that both statements "impeached his professional and personal skills."

Clear Lake and the OBHG Defendants asserted that their complained-of statements each constituted a communication made in connection with a matter of public concern, namely, a physician's provision of medical services and his competence and fitness to practice medicine. *See* TEX. CIV. PRAC. & REM. CODE § 27.001(3), (7)(B)–(C). Dr. Rockman contends that the statements do not qualify as a matter of public concern because they were not made publicly. He claims that Clear Lake's statement in its verification was "intended to reach Methodist Hospital only." He points out that Walker's email statement was made only to representatives of OBHG Management and AMN. However, the Supreme Court of Texas has recognized that statements made in a private forum are covered by the TCPA, provided they were made in connection with a matter of public concern. *See ExxonMobil Pipeline Co. v. Coleman*, 512 S.W.3d 895, 901 (Tex. 2017). As the supreme court observed, "Had the Legislature intended to limit the [TCPA] to publicly communicated speech, it could have easily added language to that effect. In the absence of such limiting language, we must presume that the Legislature broadly included both public and private communication." *Lippincott v. Whisenhunt*, 462 S.W.3d 507, 508 (Tex. 2015).

"Under the TCPA, a matter of public concern could be any matter of 'political, social, or other interest to the community' or just a 'subject of concern to the public.'" *Oncology-Hematology Consultants v. Locke*, No. 14-21-00733-CV, 2023 WL 166309, at *4 (Tex. App.—Houston [14th Dist.] Jan. 12, 2023, no pet. h.) (mem. op.) (citing TEX. CIV. PRAC. & REM. CODE § 27.001(7)(B)–(C)). In *Lippincott*, the supreme court recognized that it had "previously acknowledged that the provision of medical services by a health care professional constitutes a matter of public concern."[8] 462 S.W.3d at 510 (citing *Neely v. Wilson*, 418 S.W.3d 52, 70 nn.12 &

---

[8]     Dr. Rockman pointed out that, since *Lippincott* was decided, the definition of "matter of public concern" was amended in the 2019 amendments to the TCPA, which apply here. *See* Act of May 17, 2019, 86th Leg., R.S., ch. 378, § 1, Tex. Gen. Laws 684, 685. For this reason, he suggests that *Lippincott* is irrelevant to the analysis of whether the TCPA applies to his claims. We disagree. The direct authority cited in *Lippincott* (and referenced in its text) to support its determination that "the provision of medical services by a health care professional constitutes a matter of public concern" was *Neely v. Wilson*, a case in which the court held that a news broadcast about a physician's provision of medical services addressed a "matter of public concern" in the context of determining whether the fair-comment privilege applied to the broadcast. *See Lippincott v. Whisenhunt*, 462 S.W.3d 507, 510 (Tex. 2015) (citing *Neely v. Wilson*, 418 S.W.3d 52, 70 nn.12 & 26 (Tex. 2013)); *see also* TEX. CIV. PRAC. & REM. CODE § 73.002(b)(2) (providing that media publication is privileged if it is "reasonable and fair comment on or criticism of . . . matter of public concern published for general information"). The *Lippincott* court cited the TCPA's pre-amendment definition of "matter of public concern" but did so in conjunction with citing *Neely* as the direct authority supporting its holding. *See Lippincott*, 462 S.W.3d at 510 (citing *Neely*, 418 S.W.3d at 70 nn.12 & 26 as primary authority while citing as "see also" TEX. CIV. PRAC. & REM. CODE § 27.001(7)). We also recognize that our sister court has recently cited *Lippincott* to determine whether a statement about a physician in a defamation suit was a matter of public concern as defined in the 2019 TCPA amendments. *See Oncology-Hematology Consultants v. Locke*, No. 14-21-00733-CV, 2023 WL 166309, at *4 (Tex. App.—Houston [14th Dist.] Jan. 12, 2023, no pet.) (mem. op.).

26 (Tex. 2013) (determining that public had right to know about doctor's alleged inability to practice medicine due to his mental or physical condition)). The *Lippincott* court held that private email communications about a pediatric nurse anesthetist's (1) failure to provide adequate coverage for pediatric cases, (2) administration of the wrong narcotic, (3) falsification of medical records, and (4) violation of the facility's sterile protocol policy were "matters of public concern." *Id.* at 509–10. "In keeping with *Lippincott*, intermediate appellate courts have agreed that when a health care provider engages in communications relevant to an employee's ability to safely and competently provide medical services to patients, such communications relate to health and safety issues impacting the public and constitute matters of public concern." *Oncology-Hematology Consultants*, 2023 WL 166309, at *5; *see, e.g.*, *Pisharodi v. Columbia Valley Healthcare Sys., L.P.*, 622 S.W.3d 74, 81–82 (Tex. App.—Corpus Christi 2020, no pet.) (holding that, when defendant's communications center on plaintiff's "ability to provide competent medical services," they were matter of public concern); *Batra v. Covenant Health Sys.*, 562 S.W.3d 696, 709 (Tex. App.—Amarillo 2018, pet. denied) (determining that private communications relating to physician's "handling of specific cases, his medical competence, and disciplinary action" were "matters of public concern"); *Memorial Hermann Health Sys. v. Khalil*, No. 01-16-00512-CV, 2017 WL 3389645, at *6 (Tex. App.—Houston [1st Dist.] Aug. 8, 2017, pet. denied) (mem. op. on reh'g)

29

(holding that communications criticizing physician's competence related to health and safety issues and were made in connection with matter of public concern).

We recognize that a health care provider's statement about a health care worker will not automatically be a statement regarding a matter of public concern. *See, e.g.*, *U.S. Anesthesia Partners of Tex., P.A. v. Mahana*, 585 S.W.3d 625, 629–31 (Tex. App.—Dallas 2019, pet. denied) (recognizing that private communication about employee's alleged positive drug test or addiction was not matter of public concern "merely because the employee happens to be a nurse" when communications "[did] not address [her] job performance or relate to whether she properly provided medical services to patients"). Rather, regardless of the parties' business or occupation, the communication must have "some relevance to issues beyond the interests of the parties to be considered matters of public concern under the TCPA." *Clinical Pathology Labs., Inc. v. Polo*, 632 S.W.3d 35, 48 (Tex. App.—El Paso 2020, pet. denied) (internal quotation marks omitted); *see Goldberg v. EMR (USA Holdings) Inc.*, 594 S.W.3d 818, 828 (Tex. App.—Dallas 2020, pet. denied) (stating that court must focus on communication itself to determine whether it was made in connection with matter of public concern or whether it was "simply a communication between private parties of matters of purely private concern").

Here, focusing on Clear Lake's and the OBHG Defendants' complained-of statements reveals that neither statement was a communication regarding "purely

private matters" between the parties, such as an employment dispute. *Cf. Clinical Pathology Labs*, 632 S.W.3d at 48–49 (holding that communications regarding phlebotomist's absence from work and decision to terminate him were not related to public health concern but rather to parties' private employment dispute). Instead, the complained-of statements had relevance beyond the private or pecuniary interests of the parties. Specifically, they were statements concerning Dr. Rockman's professional competence and fitness to practice medicine—a subject matter that has consistently been recognized by Texas courts as a matter of public concern. *See Lippincott*, 462 S.W.3d at 510 (citing *Neely*, 418 S.W.3d at 70 nn.12 & 26); *Pisharodi*, 622 S.W.3d at 81–82; *Batra*, 562 S.W.3d at 709; *Khalil*, 2017 WL 3389645, at *6.

Not only does the content of the statements show that they were matters of public concern, but so does the context in which the statements were made. *See Saks & Co., LLC v. Li*, 653 S.W.3d 306, 316 (Tex. App.—Houston [14th Dist.] 2022, no pet.) ("To determine whether speech relates to a matter of public concern, courts consider the content, form, and context of the speech."). The statements were made during the credentialing process used to verify and assess Dr. Rockman's qualifications and work history to ensure that he possessed sufficient competence to practice obstetrics at Methodist Hospital in San Antonio. We agree with the OBHG Defendants' statement that "[t]he fitness of a physician to practice at a major

metropolitan hospital is certainly a matter of interest to the community and a subject of concern to the public." *See* TEX. CIV. PRAC. & REM. CODE § 27.001(7)(B)–(C).

Dr. Rockman also argues that the complained-of statements do not qualify as an exercise of Clear Lake's or OBHG Defendants' right of free speech because the statements were false. But "the truthfulness of the complained-of statements is not determinative of whether the TCPA applies." *QBE Americas, Inc. v. Walker*, No. 05-20-00439-CV, 2021 WL 1976459, at *5 (Tex. App.—Dallas May 18, 2021, no pet.) (mem. op.) (citing, inter alia, *Adams v. Starside Custom Builders, LLC*, 547 S.W.3d 890, 897 (Tex. 2018)); *see Garton v. Shiloh Vill. Partners, LLC*, No. 12-16-00286-CV, 2017 WL 6884451, at *3 (Tex. App.—Tyler Aug. 23, 2017, no pet.) (mem. op.) (explaining that movant had no burden to substantiate truth of her communications as part of initial TCPA burden).

Dr. Rockman further contends that his claims against Clear Lake are exempt from the TCPA's application. He cites the TCPA provision exempting "a legal action in which a moving party raises a defense" pursuant to certain federal and state statutes that provide immunity from liability for medical peer review and committee activities. *See* TEX. R. CIV. P. § 27.010(a)(8) (providing that TCPA does not apply to "a legal action in which a moving party raises a defense pursuant to Section 160.010, Occupations Code, Section 161.033, Health and Safety Code, or the Health Care Quality Improvement Act of 1986 (42 U.S.C. 11101 et seq.")). In his brief, Dr.

Rockman claims that, "in response to [his] pre-suit depositions and discovery requests, Clear Lake claimed the medical committee privilege to successfully avoid discovery in this case."

As the party asserting the TCPA exemption, Dr. Rockman bore the burden of establishing the applicability of the exemption to his suit. *Sullo v. Kubosh*, 616 S.W.3d 869, 886 (Tex. App.—Houston [1st Dist.] 2020, no pet.). To show that his claims against Clear Lake are exempt, Dr. Rockman points to a document— purportedly from the separately filed Rule 202 proceeding—attached to his brief. However, he does not point to where the document appears in the appellate record, nor can we locate it in the record. Because we may not consider attachments not in the record, we do not consider the attached document. *See Holland v. Mem'l Hermann Health Sys.*, No. 01-14-00283-CV, 2015 WL 7455328, at *3 (Tex. App.— Houston [1st Dist.] Nov. 24, 2015, no pet.) (mem. op.).

We also note that, in his response to the TCPA motions, Dr. Rockman acknowledged that "Clear Lake withdrew the defense of immunity under the medical committee [privilege that] it initially asserted in its 202 [pre-suit] petition." From our review of the record, the only reference that Clear Lake made to the privilege was at the hearing on Dr. Rockman's motion to depose Clear Lake's representative. There, with respect to discovery, Clear Lake mentioned that "there are privileges, especially in the credentialing area" relating to "communications that [Clear Lake]

had with Methodist." Clear Lake indicated that, to avoid a dispute involving Methodist's claim of privilege, Clear Lake had agreed to stipulate that it made the complained-of statement in its verification. But the record does not show, as Dr. Rockman claims, that Clear Lake affirmatively invoked the privilege.

Clear Lake also points out that the statutory provisions referenced in section 27.010(a)(8) pertain to peer review and committee privileges against liability, not against discovery. Defenses against discovery for medical peer review and committee privileges are contained in different statutory provisions than those referenced in TCPA section 27.010(a)(8). *See* TEX. OCC. CODE § 160.007(a) (medical peer review privilege); TEX. HEALTH & SAFETY CODE § 161.032 (medical committee privilege). In short, Dr. Rockman did not meet his burden to show that his claims were exempted from the TCPA because Clear Lake raised the affirmative defense of medical peer review or committee privilege under the statutory provisions listed in the TCPA. *See* TEX. R. CIV. P. § 27.010(a)(8).

Dr. Rockman also asserts two additional grounds for exemption under the TCPA. First, he contends that, if he was removed from Clear Lake's staff due to patient care issues, state and federal law required Clear Lake to engage in the medical peer review process before it withdrew his locum tenens privileges. He argues that, because it did not engage in the peer-review process, Clear Lake should not be permitted to use the TCPA to obtain dismissal of his claims and that his claims

34

should be exempt from the TCPA for that reason. Second, Dr. Rockman argues that his claims should be exempt from the TCPA because the defendants asserted the affirmative defense of common-law qualified privilege.

The TCPA does not provide either of the grounds cited by Dr. Rockman as a basis to exempt claims from the TCPA's application. *See id.* § 27.010(a) (listing types of legal actions exempted from TCPA). Courts must enforce statutory requirements as written and "cannot add equitable or practical exceptions . . . that the legislature did not see fit to enact." *In re Geomet Recycling LLC*, 578 S.W.3d 82, 87 (Tex. 2019) (orig. proceeding). Accordingly, the final two grounds cited by Dr. Rockman do not serve as a basis to exempt his claims from the TCPA.

After reviewing the record, we conclude that Dr. Rockman's claims are not exempt under the TCPA. And, as discussed, we conclude that the complained-of communications concerning Dr. Rockman's professional competency, which were conveyed in the context of determining whether he was fit to practice obstetrics at Methodist Hospital in San Antonio, were made in connection with matters of public concern because they each contained statements regarding "a matter of . . . interest to the community" and "a subject of concern to the public." *See* TEX. CIV. PRAC. & REM. CODE § 27.001(7)(B)–(C). The defendants were therefore exercising their "right[s] of free speech," as defined by the TCPA, when they made the complained-of communications, and Dr. Rockman filed his legal action against them based on

35

or in response to those communications. *See id.* §§ 27.001(3), (7), 27.003(a).[9] As a result, Clear Lake and the OBHG Defendants were entitled to file a motion to dismiss Dr. Rockman's defamation and business disparagement causes of action under the TCPA. *See id.* § 27.003(a) ("If a legal action is based on or is in response to a party's exercise of the right of free speech. . . that party may file a motion to dismiss the legal action.").

Because Clear Lake and the OBHG Defendants carried their burden under the first step to show that the TCPA applied, Dr. Rockman was required, under the second step, to establish "by clear and specific evidence a prima facie case for each essential element" of his claims. *Id.* § 27.005(c). But, even if Dr. Rockman met that burden, the trial court was required to dismiss his claims if Clear Lake and the OBHG Defendants established a valid defense as a matter of law. *See id.* § 27.005(d).

## C.    Defamation Claims

Because, as explained below, we conclude that Clear Lake and the OBHG Defendants each established an affirmative defense to Dr. Rockman's defamation claim as a matter of law, we need not determine whether Dr. Rockman established a

---

[9]    Because we have determined that the OBHG Defendants were exercising their free-speech rights, we need not determine whether they were also exercising their right of association. *See* TEX. CIV. PRAC. & REM. CODE § 27.005(b); *Drerup v. McQuilling*, No. 01-20-00844-CV, 2021 WL 3555727, at *7 n.4 (Tex. App.—Houston [1st Dist.] Aug. 12, 2021, pet. denied) (mem. op.).

36

prima facie case for each element of that claim. *See Sinkin & Barretto, P.L.L.C. v. Cohesion Props., Ltd.*, No. 04-20-00106-CV, 2021 WL 1649525, at *5 (Tex. App.—San Antonio Apr. 28, 2021, no pet.) (mem. op.) ("[B]ecause we ultimately conclude that S&B established affirmative defenses as to each of Cohesion's counterclaims, we need not address [the prima facie] step in the TCPA analysis."); *Choctaw Constr. Servs. LLC v. Rail-Life R.R. Servs., LLC*, 617 S.W.3d 143, 151 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (determining that defendant-movant established affirmative defense after assuming, without deciding, that TCPA non-movant had met its burden of establishing prima facie case).

When determining whether the third step has been met, at least three of our sister courts have applied a standard of review "essentially equivalent to a motion for summary judgment on an affirmative defense."[10] *Batra*, 562 S.W.3d at 708; *see Zidan v. Zidan*, No. 05-20-00786-CV, 2022 WL 17335693, at *5 (Tex. App.—Dallas Nov. 30, 2022, no pet.) (mem. op.); *Rosales v. Comm'n for Lawyer Discipline*, No. 03-18-00725-CV, 2020 WL 1934815, at *4 (Tex. App.—Austin Apr. 22, 2020, no pet.) (mem. op.). A defendant moving for summary judgment on an affirmative defense has the burden to conclusively establish every element of that

---

[10] While the 2019 amendments to the TCPA did not apply in *Batra* and *Rosales*, that distinction is meaningless given section 27.005(d)'s "matter of law" phrasing resulting from those amendments. *Zidan v. Zidan*, No. 05-20-00786-CV, 2022 WL 17335693, at *5 (Tex. App.—Dallas Nov. 30, 2022, no pet.) (mem. op.).

defense. *See Draughon v. Johnson*, 631 S.W.3d 81, 88 (Tex. 2021). A matter is conclusively established—that is, established as a matter of law—if reasonable jurors could not differ as to the conclusion to be drawn from the evidence. *See City of Keller v. Wilson*, 168 S.W.3d 802, 815–16 (Tex. 2005); *see United Servs. Auto. Ass'n v. Hayes*, 507 S.W.3d 263, 282 (Tex. App.—Houston [1st Dist.] 2016, pet. granted, judgm't vacated w.r.m.) ("A proposition is established as a matter of law when a reasonable fact finder can draw only one conclusion from the evidence presented.").

### 1.    *Substantial-Truth Defense*

Clear Lake asserted that Dr. Rockman's defamation claim should be dismissed because it established the affirmative defense of substantial truth.[11] We note that, at the end of the TCPA hearing, the trial court found that Clear Lake had proven its "affirmative defense of truth," entitling it to dismissal of Dr. Rockman's defamation claim.

---

[11]    Dr. Rockman contends that, if a nonmovant-plaintiff meets his TCPA burden to provide prima facie evidence of the falsity element of his defamation claim, then the defendant-movant cannot obtain dismissal of the claim by establishing the affirmative defense of truth. However, Dr. Rockman's assertion is contrary to our holding in *ProPublica, Inc. v. Frazier* in which we determined that the substantial-truth defense may be proved by a defendant even after a plaintiff has made a prima facie showing of all elements, including falsity. No. 01-19-00009-CV, 2020 WL 370563, at *6 (Tex. App.—Houston [1st Dist.] Jan. 23, 2020, pet. denied) (mem. op.). We held that the trial court had erred by not affording the defendant an opportunity to establish the substantial-truth defense after the plaintiff had proven his prima facie case for defamation. *See id.* at *7.

"Truth is a complete defense to defamation." *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex. 1995); *see* TEX. CIV. PRAC. & REM. CODE § 73.005(a) ("The truth of the statement in the publication on which an action for libel is based is a defense to the action."). The complained-of statement need not be true in every detail, but a defendant must show the substantial truth of the statement to establish the defense. *McIlvain v. Jacobs*, 794 S.W.2d 14, 15–16 (Tex. 1990); *see KBMT Operating Co. v. Toledo*, 492 S.W.3d 710, 714 (Tex. 2016) ("A statement need not be perfectly true; as long as it is substantially true, it is not false."). The test for substantial truth is "whether the alleged defamatory statement was more damaging to [the plaintiff's] reputation, in the mind of the average listener, than a truthful statement would have been." *McIlvain*, 794 S.W.2d at 16. In other words, "the substantial truth doctrine precludes liability for a publication that correctly conveys a story's 'gist' or 'sting' although erring in the details." *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 115 (Tex. 2000). We note that the term "gist" means "the main point or part" or "essence." *Reedy v. Webb*, 113 S.W.3d 19, 24 (Tex. App.—Tyler 2002, pet. denied) (citing WEBSTER'S COLLEGIATE DICTIONARY 493 (10th ed. 1993)).

Here, because Clear Lake conclusively showed that the statement correctly conveyed the gist of the circumstances surrounding Dr. Rockman's removal, Clear Lake established, as a matter of law, that its statement that Dr. Rockman "was

39

removed from staff on 2/5/2019 due to patient care issues" was substantially true. To establish its substantial truth defense, Clear Lake relied on Dr. Rockman's pleadings, his affidavit attached to his pleadings, and documents appended to his affidavit. The referenced pleadings and evidence showed that, on February 2, 2019, doctor Dr. Rockman assisted a Clear Lake physician in a cesarean section delivery that ended in a stillbirth. The next day, Dr. Gilpin of Mednax—Dr. Rockman's employer—called Dr. Rockman about the stillborn delivery, and they "reviewed the clinical history and outcome." At Dr. Gilpin's request, Dr. Rockman "reviewed the case with [Mednax's] attorney." A few days later, Mednax's operations director told Dr. Rockman that he was being placed on paid administrative leave.

Dr. Rockman then received a letter from Todd Caliva, Clear Lake's CEO. Caliva conveyed that he had notified Mednax on February 7 that he was exercising his discretion under the professional services agreement between Clear Lake and Mednax "to no longer accept" Mednax's use of Dr. Rockman at the hospital. Citing a provision in the hospital's medical staff bylaws, Caliva stated that his decision not to accept Mednax's continued use of Dr. Rockman was "an administrative action and [did] not entitle [Dr. Rockman] to a hearing or appeal." He also informed Dr. Rockman that the "action [was] not reportable to the National Practitioner Data Bank or Texas Medical Board." Caliva stated that Dr. Rockman held "*locum tenens* privileges to provide services at [Clear Lake] through [his] affiliation" with his

40

employer, Mednax. He explained that, because Mednax could "no longer use [him] as a representative at [Clear Lake]," Dr. Rockman was "unable to exercise his locum tenens privileges at the Hospital." After receiving Caliva's letter, Dr. Rockman was removed from on-call schedules at Clear Lake.

In May 2019, Dr. Gilpin called Dr. Rockman "indicating [that his] 'case' had been discussed at the highest corporate levels" and that "an assessment of [Dr. Rockman's] health, competency and cognitive skills" was recommended. Mednax continued to pay Dr. Rockman for several months until September 12, 2019, when Dr. Rockman accepted Mednax's offer for him to resign.

On September 24, 2019, Dowe-Royal emailed Dr. Rockman to inform him that Clear Lake had stated in its verification that he had been removed from its staff on February 5 "due to patient care issues." Dowe-Royal asked Dr. Rockman to explain the circumstances of the removal.

About an hour later, Dr. Rockman responded to Dowe-Royal's email. In his response, Dr. Rockman discussed the stillborn delivery that had occurred on February 2, 2019. He stated that the delivery had been by cesarean section and that he had assisted Clear Lake's staff doctor who had performed the procedure. He claimed that Clear Lake had ended its relationship with him to protect their doctor from criticism by shifting the blame for the stillborn delivery to him.

Given the forgoing evidence obtained from Dr. Rockman's pleadings, his affidavit, and the documents appended to his affidavit, we agree with Clear Lake that it conclusively established that its statement that Dr. Rockman was removed from its staff due to patient care issues was substantially true.

Dr. Rockman argues that the evidence cited by Clear Lake does not establish the truth of its statement because he was not expressly told why he was removed. However, the evidence relied on by Clear Lake showed that, when Dowe-Royal asked him to comment on Clear Lake's reason for his removal, Dr. Rockman's immediate response was to discuss the stillborn delivery and to claim that Clear Lake was shifting the blame for the stillborn delivery to him. In other words, Dr. Rockman appeared to know why he was removed from staff when asked to explain Clear Lake's statement.

Dr. Rockman also points out that Caliva's letter stated that Clear Lake's decision not to accept Mednax's use of Dr. Rockman was an "administrative action" under the hospital's bylaws. He contends this indicated that he was not removed for patient care issues. The reference to "administrative action" immediately followed Caliva's statement that, under the professional services agreement with Mednax, Caliva was exercising his discretion as Clear Lake's CEO not to use Dr. Rockman any further. The parties do not dispute that, under the agreement, Clear Lake had the right to discontinue Mednax's use of Dr. Rockman for any reason, including for

42

patient care reasons, or, as his attorney stated at the TCPA hearing, "if they [didn't] like Dr. Rockman's tie." Thus, when read in context, the reference to "administration action" did not indicate the specific reason for Clear Lake's decision to discontinue use of Dr. Rockman. Instead, it referenced the process by which Dr. Rockman was removed.

Dr. Rockman also points out that Caliva indicated in his letter that his decision not to permit Mednax's further use of Dr. Rockman did not trigger the medical peer review process or the duty to report the decision to the Texas Medical Board (Board) or the National Practitioner Data Bank (NPDB). Dr. Rockman asserts that, if Clear Lake had removed him from staff for patient care issues, as stated in its verification, then federal and state law required Clear Lake to engage in the medical peer review process and to report any findings of the peer review committee to the Board and to the NPDB. Similarly, Dr. Rockman contends that Clear Lake's "withdrawal" of his locum tenens privileges was subject to the peer review and reporting requirements. He reasons that Caliva's letter stating that neither the peer review nor the reporting requirements applied to the situation showed that his removal had not been for patient care issues. But, to infer that Dr. Rockman was not removed for patient care issues based on Caliva's statement that the peer review and reporting requirements did not apply would first require us to infer that Clear Lake would have engaged in peer review and reporting if Dr. Rockman's removal was for patient care issues.

43

Stated differently, before we could infer that Caliva's statements meant that Dr. Rockman was not removed for patient care issues, we would first need to infer that Clear Lake believed that, even under the contractual relationship it had with Dr. Rockman and his employer, it was required to engage in the peer review and reporting requirements if Dr. Rockman was removed for patient care issues. While we indulge reasonable inferences in Dr. Rockman's favor, reaching the conclusion urged by Dr. Rockman would require us to impermissibly stack one inference upon another. *See Zavala v. Burlington N. Santa Fe Corp.*, 355 S.W.3d 359, 373 (Tex. App.—El Paso 2011, no pet.) ("Stacking inferences is insufficient to create a fact issue precluding summary judgment.").

Moreover, the record does not support an inference that Clear Lake believed it was required to engage in the peer review process or abide by the reporting requirements if it discontinued Mednax's use of Dr. Rockman for patient care issues. To the contrary, it is not disputed that Clear Lake's position was that the peer review and reporting requirements did not apply because Dr. Rockman did not obtain his locus tenens privileges to practice at Clear Lake directly from the hospital but had obtained them through Mednax, which had a professional services agreement with Clear Lake allowing it to discontinue Mednax's use of Dr. Rockman for any reason. On appeal, Dr. Rockman asserts that "[t]he duty to report to the NPDB and the Board may not be nullified by contract." But the question of whether state and federal law

required Clear Lake to abide by the peer review and reporting requirements if it removed Dr. Rockman for patient care issues is a separate question from the question of whether Clear Lake actually removed him for patient care issues.

We conclude that Clear Lake proved, as a matter of law, its affirmative defense of substantial truth. We hold that the trial court properly dismissed Dr. Rockman's defamation claim against Clear Lake.

### 2. Qualified-Privilege Defense

The OBHG Defendants argued that Dr. Rockman's defamation claim should be dismissed against them because they had established the affirmative defense of common-law qualified privilege. *See Burbage v. Burbage*, 447 S.W.3d 249, 254 (Tex. 2014) (recognizing that qualified privilege "operates as an affirmative defense in the nature of confession and avoidance"). Qualified privilege attaches to a communication made in good faith between people with an interest sufficiently affected by the communication. *See id.* (citing *Cain v. Hearst Corp.*, 878 S.W.2d 577, 582 (Tex. 1994)). The privilege "may be proven through several factual scenarios." *Durant v. Anderson*, No. 02-14-00283-CV, 2020 WL 1295058, at *25 (Tex. App.—Fort Worth Mar. 19, 2020, pet. denied) (mem. op.). For instance, the privilege may apply to a good-faith communication "between people having a common business interest in employment-related matters or in reference to matters that the speaker has a duty to communicate to the other." *Id.* This Court has

recognized that "[a] qualified privilege attaches to statements made under circumstances in which any one of several persons having a common interest in a particular subject matter may reasonably believe that facts exist that another, sharing that common interest, is entitled to know." *Holloway v. Tex. Med. Ass'n*, 757 S.W.2d 810, 813 (Tex. App.—Houston [1st Dist.] 1988, writ denied); *see Saudi v. Brieven*, 176 S.W.3d 108, 118 (Tex. App.—Houston [1st Dist.] 2004, pet. denied) (stating qualified privilege may be shown when statement made "in good faith on a subject matter in which the speaker has a common interest with the other person"); *see also Steinhaus v. Beachside Envtl., LLC*, 590 S.W.3d 672, 677 (Tex. App.—Houston [14th Dist.] 2019, pet. denied) (listing circumstances that may give rise to qualified privilege, including when publisher holds "a belief that a person sharing a common interest in the published information is entitled to know that information").

Qualified privilege is defeated if the defendant made the statement with actual malice. *See Randall's Food Mkts.*, 891 S.W.2d at 646. Because they were seeking dismissal under the TCPA, the OBHG Defendants had the burden to prove the defense of qualified privilege as a matter of law, including an absence of actual malice. *See Zidan*, 2022 WL 17335693, at *12 (concluding that, as part of burden to prove affirmative defense of qualified privilege as matter of law, TCPA movant must prove lack of malice); *see also Tindall v. Kahlig Auto Grp. Mgmt. LLC*, No. 04-21-00368-CV, 2022 WL 16952890, at *2 (Tex. App.—San Antonio Nov. 16, 2022, no

46

pet.) (mem. op.) (recognizing that, if defendant establishes qualified privilege at trial, burden shifts to plaintiff to prove defendant made statements with actual malice, but, in context of summary-judgment proceeding, defendant must establish that statement was made without malice).

In their TCPA motion, the OBHG Defendants claimed that the defense of qualified privilege protected them from liability for Walker's statement in her November 22 email. They argued that the privilege applied because Walker's statement "was a communication furthering the common interest of the OBHG Defendants and the recipients [of the email] at AMN Healthcare." They offered the email and Walker's affidavit in support of their qualified-privilege defense.[12]

In her affidavit, Walker testified that she was OBHG Management's Director of Hospital Operations. She stated that OBHG Management assists "medical entities, such as those that employ physicians who work as ob/gyn hospitalists." OBHG Management's services include "providing assistance in locating suitable ob/gyn physicians" to work as hospitalists and "checking to ensure those physicians have the requisite qualifications to practice in the particular hospital." To perform these services, OBHG Management subcontracts with other companies, such as AMN.

---

[12] Walker's original affidavit offered in support of the OBHG Defendants' TCPA motion was amended to clarify certain facts. When we refer to Walker's affidavit, we refer to her amended affidavit.

Walker stated that, "[b]eginning in the late summer of 2019, [she] was involved in administration of efforts to fulfill staffing needs of Methodist Hospital in San Antonio." OBHG Management was tasked with assisting in the review of potential physicians and in checking to ensure that they obtained the appropriate credentials to practice at Methodist. Walker testified that her "role [was] of a general administrator; [she did] not typically interact directly with physicians or become involved in the substance of credentialing decisions or the credentialing process." As part of her role, Walker "participated in weekly conference calls with representatives from Methodist Hospital to update the status of efforts to obtain privileges for candidates to work as ob/gyn hospitalist physicians at the hospital."

Walker explained that Dr. Rockman "was identified as a potential candidate to become an ob/gyn hospitalist at Methodist Hospital." However, "[t]hrough the late summer and fall of 2019, it became apparent that the credentialing process for Dr. Rockman was taking longer than expected," and "his projected start date had to be delayed."

Walker received an email from Ledia Cano, Medical Staff Services Manager for Methodist Healthcare. In the email, which was attached to Walker's affidavit, Cano "indicated that Dr. Rockman's 'credential file [would] not be presented' to Methodist that month because the 'file requires additional review.'" Cano further indicated that "Methodist [would] aim for November review" of Dr. Rockman's

credential file with "[a] final outcome [of the review] on November 21," the day of the weekly conference call between OBHG Management and Methodist.

Walker testified that she attended the November 21 teleconference between Methodist and OBHG Management. During the teleconference, "one or more Methodist Hospital representatives informed [OBHG Management] that the hospital would not grant privileges to Dr. Rockman." Walker attested that, during the call, Methodist representatives told her the information that she later conveyed in her November 22 email: that Dr. Rockman had license sanctions, has had privileges revoked, and was currently under investigation. She stated that it was "possible that some of these statements were made to [her] in a follow-up conversation" with two of Methodist representatives that same day. But Walker testified that she was "certain . . . that these statements were made directly to me by Methodist Hospital representatives on November 21, 2019."

On the afternoon of November 21, Walker received an email from Taj Castle, a Methodist employee. In the email—which is attached to Walker's affidavit— Castle explained that Dr. Rockman's status was "up in the air" and that Methodist was "likely cancelling his credentials."

Walker explained in her affidavit that she had sent her November 22 email to four OBHG Management representatives and to three AMN representatives, "recounting what [she] had been told by Methodist Hospital representatives."

Walker attested that she sent the email to AMN Healthcare representatives "to inform them of Methodist Hospital's decision to not issue privileges to Dr. Rockman so his application could be withdrawn, so he would not have a denial of privileges on his record."

In sum, the record shows that Walker shared the information relating to Dr. Rockman's professional competency with OBHG Management and AMN representatives because they were working together toward a common goal of providing suitable physicians to meet Methodist Hospital's ob/gyn staffing needs. Accomplishing that common goal would naturally entail not only communicating with the other representatives about the physician's credentialling status but would also entail sharing information about the physician's professional competency, including whether he had license sanctions, privileges revoked, or was currently under investigation. The record indicates that sharing that information was necessary to ensure that OBHG Management and AMN met their joint goal of offering only qualified ob/gyn physicians to Methodist. And it indicates that Walker shared the information so that the email recipients would know how to proceed with Dr. Rockman's application. Thus, the OBHG Defendants met their burden of showing, as a matter of law, that the common-interest qualified privilege applied to Walker's complained-of statement in her email. *See Saudi*, 176 S.W.3d at 118 (concluding that common-interest qualified privilege applied to defamatory statements made

during meeting and phone call between representatives of three companies because there was "[an] interlocking business relationship" among them).

We must next consider whether the OBHG Defendants' evidence established that Walker's statement was made without actual malice. *See Randall's Food Mkts.*, 891 S.W.2d at 646. "Actual malice" means that the statement was made with knowledge of its falsity or with reckless disregard for its truth. *In re Lipsky*, 460 S.W.3d 579, 593 (Tex. 2015) (original proceeding). Reckless disregard exists when "the defendant in fact entertained serious doubts as to the truth of his publication" or had a "high degree of awareness of [its] probable falsity." *Bentley v. Bunton*, 94 S.W.3d 561, 591 (Tex. 2002). "A defendant can negate actual malice as a matter of law by presenting evidence that she did not publish the statement with knowledge of its falsity or reckless disregard for its truth." *Hardy v. Commc'n Workers of Am., Inc.*, No. 05-19-01388-CV, 2021 WL 5860922, at *5 (Tex. App.—Dallas Dec. 10, 2021, pet. denied) (mem. op.) (citing *Huckabee v. Time Warner Entm't Co.*, 19 S.W.3d 413, 420 (Tex. 2000)).

Dr. Rockman correctly points out that the Supreme Court of Texas has indicated that proof of actual malice is not alone defeated by a defendant's self-serving protestation of sincerity. *See Bentley*, 94 S.W.3d at 597. Rather, to negate actual malice, an affidavit from an interested witness, such as Walker, "must

51

establish the defendant's belief in the challenged statements' truth and provide a plausible basis for this belief." *Huckabee*, 19 S.W.3d at 424.

In her affidavit, Walker testified that, as OBHG Management's Director of Hospital Operations, she was "involved in administration of efforts to fulfill staffing needs of Methodist Hospital in San Antonio." As part of her job, she "participated in weekly conference calls with representatives from Methodist Hospital to update the status of efforts to obtain privileges for candidates to work." It was either during the weekly teleconference with Methodist, or in a follow-up conversation with two Methodist representatives that same day, that she learned that Dr. Rockman had license sanctions, had privileges revoked, and was under investigation. Walker testified that she was told that information "by [Methodist representatives] Kassandra Meadows and/or Ledia Cano." She identified Meadows as "VP of Nursing" and Cano as "Medical Staff Services Manager." Her affidavit and an email attached to it also showed that Walker received an email that same day from another Methodist representative, Taj Castle, indicating that Dr. Rockman would likely not receive credentials to practice there.

Walker testified that she "had no actual doubts about the truth of the information that was provided to [her at the meeting] and that [she] conveyed" to the OBHG Management and AMN representatives in her email the next day. She

52

testified that she "had no reason to doubt the information's truthfulness" and that "[t]he information was provided to [her] by sources [she] considered to be reliable."

In short, Walker's affidavit (1) established her belief in the challenged statements' truth and (2) provided a plausible basis for that belief. *See id.* The OBHG Defendants also offered (1) Cano's email indicating that there were delays with Dr. Rockman's credentialing because the hospital was gathering additional information and (2) Castle's email in which she indicated that Dr. Rockman credentialing was "up in the air" and that Methodist Hospital was "likely cancelling his credentials." Thus, the OBHG Defendants sufficiently negated actual malice. *See WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 574 (Tex. 1998).

In his TCPA response, Dr. Rockman cited evidence that he claimed controverted Walker's affidavit testimony. Among that evidence was the letter from Methodist's counsel contained in Exhibit B-1 and an email from AMN's attorney contained in Exhibit B-2. As discussed, the trial court sustained the OBHG Defendants' objections to the letter and to the email, and we have overruled Dr. Rockman's challenge to the trial court's ruling. By sustaining the objections to Exhibits B-1 and B-2, the trial court in effect struck the exhibits, *see Saudi*, 176 S.W.3d at 112, and we may not consider evidence struck from the record, *see Hudson v. Mem'l Hosp. Sys.*, No. 01-19-00300-CV, 2021 WL 1414283, at *10 (Tex. App.—Houston [1st Dist.] Apr. 15, 2021, no pet.) (mem. op.) ("When reviewing

53

whether a summary judgment was properly granted, we may not consider evidence struck from the record because that evidence is not a part of the summary-judgment record considered by the trial court.").

Dr. Rockman also pointed to the October 2019 letter from MPLT, which listed the dates that he was scheduled to work at Methodist Hospital, starting in December 2019. He asserts that the letter showed that the OBHG Defendants had already determined that he was suitable to work at Methodist, and thus, Walker should have known that the information she learned from Methodist was false. However, Dr. Rockman offered no evidence to show MPLT's statements in its letter were attributable to the OBHG Defendants. Nor did he show that the OBHG Defendants had engaged in a review process of his credentials at that point or had been provided information about his credentials. And, more specifically, his evidence did not show that Walker was aware of her statement's falsity. In addition, the October 2019 letter stated that Dr. Rockman's "[s]tart date and assignment [were] contingent upon credentialing," indicating that his fitness and suitability were still under review.

Dr. Rockman further asserted that it was Walker's job to determine whether he was suitable to work at Methodist and that she should have known that the information she received from Methodist was false. He asserted that, if she had inquired with the Board and the NPDB, she would have learned that he had no license sanctions or privilege revocations. But Dr. Rockman offered no evidence to

54

show that it was Walker's job to investigate his suitability. To the contrary, Walker testified that her "role [was] of a general administrator" and that she did not "become involved in the substance of credentialing decisions or the credentialing process." We note that "the mere failure to investigate the facts, by itself, is no evidence of actual malice." *Bentley*, 94 S.W.3d at 595; *see Akin v. Santa Clara Land Co*., 34 S.W.3d 334, 341–42 (Tex. App.—San Antonio 2000, pet. denied) ("Negligence, failure to investigate the truth or falsity of the statements prior to publication, or failure to act as a reasonable prudent person is insufficient to support a finding of malice.").

Finally, Dr. Rockman asserts that he provided reports from the Board and the NPDB to the OBHG Defendants reflecting that he had no license sanctions. To support this assertion, Dr. Rockman points to two emails in the record. He cites an email from MPLT to a general OBHG email address (and to other named recipients) that discusses Walker's November 22 email, but MPLT's email does not indicate that the OBHG Defendants, and more particularly Walker, were provided with information from the Board or the NPDB before Walker sent the email. Dr. Rockman also cites an October 2019 email between MPLT and AMN, indicating that Methodist was delaying a credentialling decision on Dr. Rockman's file for additional review, but the email provided no indication that reports from the Board or the NPDB had been sent to the OBHG Defendants. In other words, Dr. Rockman

offered no evidence that controverted the OBHG Defendants' evidence demonstrating that Walker acted without actual malice.

We conclude that, with respect to Dr. Rockman's defamation claim, the OBHG Defendants proved, as a matter of law, their affirmative defense of qualified privilege and that Walker did not act with actual malice. We hold that the trial court properly dismissed Dr. Rockman's defamation claim against the OBHG Defendants.

## D. Business Disparagement Claims

Next, we turn to Dr. Rockman's business disparagement claims to determine whether he met his TCPA burden to establish by "clear and specific evidence a prima facie case for each essential element" of those claims. *See* TEX. CIV. PRAC. & REM. CODE § 27.005(c). A "prima facie case" refers to evidence that is "sufficient as a matter of law to establish a given fact if it is not rebutted or contradicted." *Landry's, Inc. v. Animal Legal Def. Fund*, 631 S.W.3d 40, 54 (Tex. 2021). It is "the minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true." *Id.* (internal quotation marks omitted). Evidence of a prima facie case must be clear and specific to avoid dismissal, meaning that a "plaintiff must provide enough detail to show the factual basis for its claim." *Id.*

### 1. *The OBHG Defendants: No Clear and Specific Evidence of Malice*

To meet his TCPA burden for his business disparagement claim against the OBHG Defendants, Dr. Rockman was required to offer clear and specific evidence

that (1) the OBHG Defendants published false and disparaging information about him, (2) with malice, (3) without privilege, and (4) that resulted in special damages to him. *Lipsky*, 460 S.W.3d at 592; *ADB Int., LLC v. Wallace*, 606 S.W.3d 413, 435 (Tex. App.—Houston [1st Dist.] 2020, pet. denied). The malice element of a business disparagement claim may be proven by evidence that the defendant made a statement with knowledge of its falsity, reckless disregard, ill will, or intent to interfere with the economic interest of the plaintiff. *Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 766 (Tex. 1987).

As discussed in the preceding section, the evidence that Dr. Rockman relied on to show that Walker made the complained-of statement in her November 22 email with knowledge of falsity or with reckless disregard for the falsity of the statement did not controvert the OBHG Defendants' evidence establishing no actual malice. As to ill will and intent to interfere with his economic interests, Dr. Rockman does not cite to any evidence, and we have found no evidence in our independent review of the record, supporting an inference that Walker had ill will toward him or intended to interfere with his economic interests by making the complained-of statement to the representatives of OBHG Management and AMN. *See Robert B. James, DDS, Inc. v. Elkins*, 553 S.W.3d 596, 613 (Tex. App.—San Antonio 2018, pet. denied).

We conclude that Dr. Rockman did not produce clear and specific evidence to establish a prima facie case for the malice element of his business disparagement

57

claim against the OBHG Defendants. *See* TEX. CIV. PRAC. & REM. CODE § 27.005(c). Therefore, we hold that the trial court properly dismissed that claim.

### 2. *Clear Lake: No Clear and Specific Evidence of Special Damages*

In the context of business disparagement, special damages "are economic damages such as for lost income." *Waste Mgmt. of Texas, Inc. v. Texas Disposal Sys. Landfill*, 434 S.W.3d 142, 155 (Tex. 2014). To meet his TCPA burden against Clear Lake, Dr. Rockman was required to offer clear and specific evidence that Clear Lake's statement about patient care issues resulted in special damages to him.

In his pleadings, Dr. Rockman alleged that, "[a]s a direct and proximate result of Defendants' publication of the defamatory and disparaging statements, [his] employment was terminated by Clear Lake on February 7, 2019." In his TCPA response, he pointed to his affidavit testimony in which he stated that, in addition to Clear Lake, he was removed from the on-call schedules of other hospitals in February 2019. However, Clear Lake's complained-of statement concerning his removal from Clear Lake's staff in February 2019 was made in September 2019. Thus, the September 2019 statement could not have caused Dr. Rockman to incur economic damages in February 2019.

In his TCPA response, Dr. Rockman claimed that, "once the September 24, 2019 verification for Clear Lake was provided to Methodist, it delayed his start date and eventually caused the cancelation of Dr. Rockman's hospitalist coverage for

Methodist, all of which is directly attributable to the false publications made by Clear Lake." But Dr. Rockman offered no evidence to prove that Methodist received Clear Lake's statement. Instead, in his appellate brief, Dr. Rockman states that "[i]t is logical to conclude Clear Lake gave the negative misinformation to Methodist, presumably causing Methodist to reject Rockman as an applicant." But, beyond his conjecture, he provided no evidence showing Methodist received Clear Lake's statement. But even assuming it received the statement, Dr. Rockman offered no evidence proving the fundamental facts essential to reach the conclusion that Clear Lake's statement caused Methodist not to grant him privileges.

The only evidence of causation Dr. Rockman points to shows that he had learned from MPLT that he had been rejected by Methodist "due to statements made in regard to my professional integrity and clinical skills based on the untrue statements regarding sanctions against me, purported revocation of privileges, and ongoing and current investigation(s)." In other words, the only evidence of causation cited by Dr. Rockman indicated that he was rejected because of Walker's statement, not because of Clear Lake's statement, and Dr. Rockman offered no evidence linking Walker's statement to Clear Lake. *See Landry's*, 631 S.W.3d at 55 (holding that plaintiff failed to make prima facie showing of economic damages for business disparagement claim when its evidence was "insufficient to support a causal link between any particular statement of the defendants" and plaintiffs' lost revenue).

Dr. Rockman further alleged in his pleadings that he had "found it impossible to find an assignment [after Clear Lake's statement] whereas he previously had no issues securing employment." He claimed that, "[b]ecause of the publication of the defamatory and disparaging statements, and their effect on [his] reputation, [he was] unable to obtain any comparable employment." But, beyond a temporal correlation, Dr. Rockman offered no evidence to show a causal link between Clear Lake's complained-of statement and his inability to secure employment. His lack of evidence was confirmed at the TCPA hearing when the trial court asked Dr. Rockman, "So your entire argument [regarding causation of damages] is temporal?" to which he responded, "That's the evidence that I have right now." As this Court has previously recognized, a temporal connection "is insufficient to establish damages for purposes of the TCPA." *ABD Interest*, 606 S.W.3d at 437 (citing *Better Bus. Bureau of Metro. Hous., Inc. v. John Moore Servs., Inc.*, 441 S.W.3d 345, 361 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) (holding that evidence of business's declining general revenue in wake of negative online review was not clear and specific evidence establishing damages element of tortious interference claim)).

We conclude that Dr. Rockman did not produce clear and specific evidence to establish a prima facie case for the special damages element of his business disparagement claim against Clear Lake. *See* TEX. CIV. PRAC. & REM. CODE § 27.005(c). Therefore, we hold that the trial court properly dismissed that claim.

60

Having held that the trial court properly dismissed Dr. Rockman's defamation and business disparagement claims against Clear Lake and the OBHG Defendants under the TCPA, we overrule Dr. Rockman's first issue.[13]

**Conclusion**

We affirm the judgment of the trial court.

Richard Hightower
Justice

Panel consists of Justices Goodman, Hightower, and Guerra.

---

[13] Because we affirm the dismissal of Dr. Rockman's claims against the OBHG Defendants under the TCPA, we need not reach Dr. Rockman's third issue pertaining to his request for exemplary damages. *See* TEX. R. APP. P. 47.1 ("The court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal."). We also need not reach Ob Hospitalist Group, Inc.'s alternative issue challenging the denial of its special appearance. *See id.*; *Jack H. Brown & Co. v. Nw. Sign Co.*, 718 S.W.2d 397, 398 (Tex. App.—Dallas 1986, writ ref'd n.r.e.) (stating that, because it affirmed summary judgment in defendant's favor, appellate court need not reach defendant's alternative challenge to denial of its special appearance).